UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

| | | |
|---|---|---|
| KAPLAN GROUP INVESTMENTS LLC, | ) | |
| EXOS FUNDS MRP1 LLC, | ) | |
| CARDINAL SPECIALTY CREDIT | ) | |
| FUND LLC, | ) | |
| M42 TACTICAL INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  22-cv-7326 |
| v. | ) | |
| | ) | **COMPLAINT** |
| A.S.A.P. LOGISTICS LTD., | ) | |
| DEBORAH CROSS, | ) | JURY TRIAL DEMANDED |
| SHARON SACRAMONE, | ) | |
| GUVEN ACARER, | ) | |
| SNOOZ MATTRESS LLC a/k/a SNOOZ | ) | |
| CORP. LLC, | ) | |
| OCTAVIO FERMIN, | ) | |
| JEIMY M. PENA FERMIN, | ) | |
| ASAP LOJISTIK VE SAVUNMA | ) | |
| TICARET LIMITED SIRKETI d/b/a | ) | |
| ASAP LOGISTICS AND DEFENSE | ) | |
| and/or ASAP LOGISTICS AND | ) | |
| DEFENSE GUVENLIK HIZMETLERI | ) | |
| SANAYI VE TICARET LIMITED | ) | |
| SIRKETI, | ) | |
| | ) | |
| Defendants. | ) | |

--------------------------------------------------------

Plaintiffs Kaplan Group Investments LLC ("KG"), Exos Funds MRP1 LLC ("Exos"),

Cardinal Specialty Credit Fund LLC ("Cardinal"), and M42 Tactical Inc. ("M42"), through their

counsel, Parlatore Law Group LLP, respectfully submit the instant Complaint as follows:

### INTRODUCTION

1. This is an action against Debbie Cross ("Cross"), and the various members and

associates of A.S.A.P. Logistics Ltd. ("ASAP"), including ASAP's web of fraudulently related

businesses and sham businesses, for their deceitful and corrupt actions undertaken as part of an ongoing scheme to unlawfully defraud Plaintiffs and other legitimate businesses similar to Plaintiffs, as well as to enrich themselves at Plaintiffs' expense.

2.     Defendants have taken advantage of market inequities on a global scale. Defendants have planned, orchestrated, and executed a large, complex and brazen fraudulent scheme with the target objective of defrauding purchasers of in-demand commodities such as Personal Protective Equipment ("PPE"), small arms ammunition, and the like.  Defendants have been, and are continuing to pursue this objective through a pattern of misrepresentations and the repeated creation of sham businesses carefully constructed to mimic legitimate companies that actually produce the commodities pedaled by Defendants, trading on the good will and reputation of their unwitting victims.

3.     Plaintiffs, a consortium of investment funds who, among other business ventures, obtain and re-sell high value products in large quantities, have suffered immense damages by Defendants' pattern of deceptive and fraudulent activity between November of 2020 and continuing into 2022.  Because of their business relationships with each other, Plaintiffs have been uniquely situated both to be significantly harmed by Defendants and to be able to piece together Defendants' brazen schemes despite Defendants' usage of multiple sham businesses.

4.     Beginning in November of 2020, while the global pandemic caused by Covid-19 was at its height and the demand for PPE was felt on an international scale, Plaintiff KG first fell afoul of Defendants' schemes.  Between November and December of 2020, KG and its affiliates Exos and Cardinal contracted and paid for specific legitimate types of PPE protective masks and nitrile gloves.

5.     Unbeknownst to Plaintiffs, Defendant Cross and her associates, using ASAP as the center of the spider's web, was working through multiple sham businesses which claimed to hold exclusive contracts with producers of PPE, or to have purchased the entire United States supply of a particular product, or a combination thereof.  Believing that they were dealing with legitimate vendors, Plaintiffs paid millions of dollars for what turned out to be counterfeit goods.  When the defective products were discovered, Plaintiffs refunded the entire purchase costs to their customers, in one case obtaining replacement products from another vendor. Defendants, upon being confronted with the counterfeit nature of the goods they had provided, gave a series of excuses but refused to make Plaintiffs whole.

6.     Having discovered a profitable scheme and having a substantial amount of capital gained from defrauding Plaintiffs, Defendants moved on to small arms ammunition, which in early 2021 was also in short supply and high demand.  Defendants created another sham company.   This time, Defendants claimed to be the exclusive vendors of high-grade ammunition, able to offer prices that were available to no one else in the world.  Defendants approached Plaintiffs through Plaintiff M42, claiming that their political connections and exclusive relationships were so extensive that they could offer an extremely lucrative ammunitions deal that would offset some of the losses from the PPE.  As detailed further below, the Defendants' lies and misrepresentations in this instance were so widespread and persistent that they led to not only a further loss of more than forty-seven million dollars to Plaintiffs but to the global destabilization of the ammunition market.

7.     The brazen conduct of Defendants has caused tens of millions of dollars' worth of damage to Plaintiffs in lost funds, lost profits, lost business opportunities and reputational harm. Further, Defendants have implicated a foreign Ambassador and one Defendant, Guven Acarer

("Acarer"), has been so bold as to impersonate both a federal investigator and a Turkish Colonel and Pentagon liaison.  The depth of Defendants' deceit, while shocking beyond doubt, will be proven at trial.

## PARTIES, JURISDICTION, AND VENUE

8.     Plaintiff KG is a limited liability company, formed and headquartered in Arizona, and acts as an investment fund focusing on both direct investments and secondary loans.

9.     Plaintiff Exos is an Arizona limited liability company, headquartered in Arizona, and acts as an investment fund.  Exos is an affiliate of KG.

10.    Plaintiff Cardinal is a New Mexico limited liability company, headquartered in Arizona, and acts as an investment fund. Cardinal is an affiliate of KG.

11.    Plaintiff M42 is incorporated and headquartered in Florida and is engaged in the import and wholesale of rifle and handgun ammunition.  M42 is an affiliate of KG.

12.    Defendant A.S.A.P. Logistics Ltd. ("ASAP") is a corporation formed in Delaware and with a principal place of business in Jamaica, New York.

13.    Defendant Deborah Cross ("Cross") is an individual residing in the State of New York. Cross is the President, Chief Executive Officer, or Manager of ASAP.

14.    Defendant Sharon Sacramone ("Sacramone") is an individual residing in the State of New York.  Sacramone is a Manager at ASAP and the sister of Cross.

15.    Defendant Guven Acarer ("Acarer") is an individual residing on information and belief in the country of Turkey.  Acarer has an ownership interest in ASAP.

16.    Defendant Snooz Mattress LLC a/k/a Snooz Corp. LLC ("Snooz") is a limited liability company, formed in New Jersey, and acts as a seller of Personal Protective Equipment ("PPE").

17.    Defendant Octavio Fermin ("Fermin") is an individual residing in the State of New Jersey.   Fermin is the putative principal of Snooz and has extensive ties to Cross and ASAP.

18.    Defendant Jeimy Pena Fermin ("Pena Fermin") is an individual residing in the State of New Jersey.  Pena Fermin is listed by the New Jersey Department of Treasury as the Registered Agent and Member Manager of Snooz.

19.    Defendant Asap Lojistik Ve Savunma Ticaret Limited Sirketi d/b/a Asap Logistics and Defense and/or Asap Logistics and Defense Guvenlik Hizmetleri Sanayi Ve Ticaret Limited Sirketi ("ASAP Turkey") is a Turkish company formed under the laws of Turkey, having its principal place of business at Yeşilköy Mh, Dünya Ticaret Merkezi, EGS, Business Park B2 Blok, Kat: 2 No: 139-140 Yeşilköy Bakırköy, İstanbul, Turkey.

20.    On information and belief, Acarer and ASAP Turkey derive substantial revenue from international commerce and reasonably expected their tortious conduct to have consequences in this jurisdiction.

21.    On information and belief, ASAP, ASAP Turkey, Snooz, Cross, Sacramone and Fermin do not follow corporate formalities but instead act as agents of each other and co-mingle assets and liabilities.

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest

and costs, and there is complete diversity of citizenship between the parties.  This Court has jurisdiction over Plaintiffs' related state law and common law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

23.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts complained of herein occurred in this judicial district and each party is subject to personal jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS

24.    As part of its business, KG regularly finances private transactions and investment opportunities, including obtaining supplies for customers such as in the area of Personal Protective Equipment ("PPE") supplies, and uses its capital to purchase and resell PPE supplies on a large scale.

25.    PPE-related transactions are often financed through one of KG's affilates, Exos.

26.    Cardinal, another KG affiliate, has also financed PPE-related transactions.

27.    ASAP purports to be a customs broker and freight shipping company specializing in interstate and international shipping services; however, ASAP also acts as a supplier of some products, including PPE.  ASAP does this both independently and through agent businesses.

28.    As a customs broker, one of ASAP's obligations is to ensure that any products it imports as part of its services are in full compliance with all applicable rules and regulations.

29.    ASAP operates within the United States from its Jamaica, New York headquarters and internationally both as the parent company and through affiliated companies such as ASAP Turkey.

30.   As part of its international network, on information and belief, ASAP and/or its affiliates and associates have developed a pattern of founding companies to supply products in high demand, such as PPE or ammunition, and naming the companies to mimic the names of well-established businesses in order to gain the trust and confidence of potential customers.

31.   Fermin, an ASAP and Cross associate, founded such a company in New Jersey; Snooz Mattress LLC mimics the name of the well-established Snooze Mattress Company, and traded upon its reputation, but offered PPE items including masks for sale rather than focusing on mattresses.

32.   On information and belief, ASAP and/or its affiliates and associates formed a similar company in China, mimicking the name and approximate location of Hangzhou Niujian Gloves Co., Ltd., a legitimate supplier of nitrile gloves as PPE.

33.   ASAP formed ASAP Turkey in Turkey to enter the ballistics and ammunition market, mimicking the approximate location of and claiming to exclusively represent a legitimate manufacturer, Makina ve Kimya Endustrisi A.S ("MKE").

34.   With each affiliated sham company, ASAP and/or its allies and associates present themselves as legitimate businesses by providing supporting documentation, frequently constituting trademark infringement, and by declaring extensive political connections, such as with the Turkish Ambassador to the United States, Ambassador Murat Mercan.

**"3M" MASKS**

35.    In November of 2020, one of KG's regular business partners, a healthcare supply company, approached KG to inquire if KG or its affiliate Exos could provide brand 3M Model 1860 N95 masks in significant quantities and in short time frames.

36.    One of the healthcare supply company's customers, a hospital system, was looking to order a large quantity of such masks in both regular and small sizes.  The hospital system was specifically looking only for 3M brand N95 masks, Model 1860.

37.    3M is the only manufacturer who makes a Model 1860 face mask.

38.    KG, through Exos, agreed to finance the transaction if it could locate masks that would meet the specifications.

39.    Exos asked various of its agents to make inquiries to determine if 3M 1860 N95 masks could be procured for immediate resale and delivery.  One of the agents informed Exos that he believed he could find the appropriate masks.

40.    Exos, through its agents, had previously arranged some PPE-related transactions through ASAP and Cross; Cross had subsequently connected Exos' agent with Fermin and Snooz.

41.    Cross directed Exos, through its agent, to Snooz and Fermin in response to Exos's inquiry about the 3M masks.

42.    Fermin represented that Cross had been correct and that Snooz could provide Exos with authentic 3M 1860 N95 masks in the necessary quantities.

43.    Fermin further represented that many of the masks were already in Snooz's possession in the United States and that they could therefore be delivered very quickly.

44.    Fermin claimed that the 3M 1860 N95 masks that were in Snooz's possession were authentic and genuine 3M products.

45.    Fermin quoted a per unit price for the masks that was in line with the wholesale market price at the time for genuine 3M 1860 masks.

46.    At Exos's request, Fermin provided documents, including inspection forms, that Fermin claimed confirmed the authenticity of the masks that Snooz was offering for sale to Exos.

47.    At no time did Snooz, Fermin, Pena Fermin, or anyone else connected to Snooz give any indication to anyone at Exos or KG that the masks were counterfeit.

48.    Snooz provided Exos with several different invoices for the masks.  With each invoice, Snooz demanded immediate payment.

49.    KG paid the Snooz invoices in full via wire transfers from Exos's bank account.

50.    Exos wired its funds to the wire information provided on Snooz's invoices.

51.    On November 18, 2020, Exos wired Snooz $810,000 pursuant to Snooz Invoice No. 98107, issued on November 17, 2020, for 300,000 3M 1860 masks at $2.70 per mask.

52.    On November 23, 2020, and November 24, 2020, Exos sent two separate wires to Snooz for a total of $765,000 pursuant to Snooz Invoice No. 98140, issued on November 22, 2020, for 300,000 3M 1860 masks at $2.55 per mask.

53.    On November 25, 2020, Exos wired Snooz $2,510,000 pursuant to Snooz Invoice No. 98147 for 1,000,000 3M 1860 masks at $2.51 per mask.

54.    On December 4, 2020, Exos wired Snooz $1,518,500 pursuant to Snooz Invoice No. 98204 for 605,000 3M 1860 masks at $2.51 per mask.

55.    On December 21, 2020, Exos wired Snooz $1,255,000 pursuant to Snooz Invoice No. 98643 for 500,000 3M 1860 masks at $2.51 per mask.

56.    Exos paid Snooz a total of $6,858,500 under five separate invoices (collectively, "Snooz Invoices") for 2,705,000 masks.

57.    Each of the Snooz Invoices identify the masks being sold as "1860 N95 Niosh Mask."

58.    Each Snooz Invoice referenced a "terms and conditions" provision in "Exhibit A" yet there was no "Exhibit A" attached to any of the Snooz Invoices that Snooz sent to Exos. Accordingly, no "terms and conditions" beyond those in the purchase orders were provided to Exos by Snooz.

59.    Exos, through its agent, arranged and paid to transport the masks from what Exos believed to be Snooz's facility in California to the hospital system that was the end customer of the masks.

60.    With each shipment of masks, Exos was not allowed by Snooz or Fermin to have its agent or any independent inspector on Exos's or KG's behalf enter the warehouse to inspect the masks before they were loaded for transport.

61.   The masks were delivered to the hospital system, which then paid Exos's healthcare supplies company customer for the masks.

62.   Exos's healthcare supplies company customer in turn paid Exos for financing and arranging the purchase of the masks.

63.   In February of 2021, the hospital system contacted Exos's healthcare supplies company customer after a letter from 3M questioned the authenticity of certain 3M 1860 masks in the marketplace, in particular any masks that had not been manufactured in the United States.

64.   The masks supplied by Snooz and Fermin were labeled as if they had been manufactured in the United States and at least one of the inspection reports provided by Fermin to Exos described United States-made products.

65.   Fermin acknowledged that the masks had not been made in the United States but claimed that they were nevertheless authentic.

66.   The United States Government determined the masks that Snooz sold Exos were not manufactured in the United States and were instead counterfeit and were not genuine 3M products.

67.   Exos has not been able to definitively determine where outside of the United States the counterfeit masks were manufactured.

68.   Because the masks supplied by Snooz turned out to be counterfeit and were not authentic 3M products, Exos and its customer refunded the hospital system the entirety of what the hospital system had paid for the masks.

69.    Exos immediately contacted Snooz and attempted to get a refund based on Snooz's affirmative misrepresentations regarding the masks.

70.    Snooz and Fermin refused to either provide a refund or arrange for either Exos or the end customer to be made whole.

71.    After Exos had refunded the purchase price and arranged for the removal of the counterfeit masks, Special Agents from the United States Department of Homeland Security informed Exos that the United States Government would like to examine all 1,705,000 counterfeit masks that Snooz had sold to Exos, and that were in turn shipped to the hospital system.  Exos then turned the masks over to the requesting Special Agents.

72.    After completing their inspection, Special Agents from the United States Department of Homeland Security further informed Exos that all 1,705,000 counterfeit masks that Snooz sold Exos had been scheduled for destruction by the United States Government and would be destroyed.

73.    Exos – and accordingly KG – has lost the entirety of the millions of dollars it paid to Snooz for the masks.

74.    Including the refunded purchase price of the masks, Exos has also suffered $10,309,970.00 in indirect and consequential damages arising from the costs of transporting and delivering the masks, investigating the legitimacy of the masks after it had been approached by its customer, in the lost use of its funds, and in potential reputational harm.

75.    Upon information and belief, Cross, Sacramone, Fermin and/or Pena Fermin exercised complete domination over Snooz in all aspects of the mask transaction involving KG and Exos.

76.    This dominion was used to commit a wrong against KG and Exos which resulted in Exos's injury.

77.    Upon information and belief, the funds paid by Exos to Snooz were transferred in substantial part to ASAP.

78.    Upon information and belief, at all times relevant to this Complaint, Fermin and Pena Fermin failed to maintain a formal legal separation between Snooz and their personal financial affairs, thereby rendering the Snooz business entity as the alter ego of Fermin and Pena Fermin.

79.    On June 11, 2021, then-counsel for Exos wrote to Defendants to put Defendants on notice that the masks were defective in that they were not genuine 3M products, and to demand that Defendants repay the entire sum that Exos had paid for the counterfeit masks which had been seized by the United States Government.

80.    Subsequent correspondence from Defendants' counsel – a solo practitioner representing both Snooz and ASAP and Cross, in a further indication of the close ties between the companies and their principals – indicated Defendants had no interest in settling the dispute before Exos commenced litigation.

## NITRILE GLOVES

81.   KG, again acting through Exos and its agents, worked directly with ASAP to fill another set of PPE orders in November and December of 2020, in this case for medical grade nitrile gloves to be used as PPE.

82.   For these orders, ASAP was responsible for inspection, arranging customs clearance, and with at least some of the gloves, for supplying the actual product.

83.   The gloves requested by KG's customer, and as ordered and paid for by KG's affiliates, were medical grade nitrile gloves, which would by definition be latex-free.

84.   ASAP represented that they were the sole United States distributor authorized to import and distribute nitrile gloves from Hangzhou Niujian Gloves Co., Ltd. ("Niujian").

85.   Niujian, on information and belief a sham organization similar to Snooz and affiliated with ASAP, with a location in Hangzhou China, represented itself to have an exclusive contract to manufacture and distribute V-glove nitrile gloves, thus being an exclusive source for desperately-needed PPE.

86.   At the time this false representation was made, V-glove was a primary manufacturer of medical grade nitrile gloves worldwide.

87.   ASAP, Cross and Sacramone informed Exos through its agent that Snooz had already purchased all of the incoming stock from Niujian and that Snooz was therefore the sole United States source of medical grade nitrile gloves in the quantities sought by Exos' customers.

88.   In November of 2020, KG, through Exos, ordered medical grade nitrile gloves from ASAP, with Snooz acting as the supplier.

89.    Exos paid for the gloves in full and arranged to have them transported to its end customer, a state police department.

90.    Exos made its payment to ASAP directly.

91.    The initial order, again involving Snooz as the origin of the gloves, had a 14-day turnaround guarantee as part of the contract price yet took more than five months to fill.

92.    When the gloves from Snooz finally reached their destination, the state police department realized that although the gloves that had been delivered were boxed and labeled as nitrile gloves, the gloves contained in the boxes were in fact latex gloves, some of which appeared to be used, and which did not meet the specifications provided by KG and Exos to Snooz and ASAP.

93.    At all times Snooz and/or ASAP had contracted to supply medical grade nitrile gloves, not latex gloves.

94.    ASAP had both cleared the gloves as a customs broker and obtained them directly from Snooz – who had purportedly purchased them from Niujian through ASAP – before reselling them to Exos.

95.    Because the gloves turned out not to be medical grade nitrile gloves despite their packaging and the representations of the sellers, KG and Exos arranged to take the gloves back from the state police department, and then KG and Exos paid for a legitimate replacement product from a legitimate supplier to be provided to the state police department in place of the defective product.

96.    The cost to KG – and to Exos – to both retrieve the counterfeit gloves and to replace them was in excess of $1,900,000.

97.    Exos immediately notified ASAP of the condition of the gloves and sought a refund.

98.    ASAP, Sacramone, and Cross all initially refused to accept a return of the gloves or to offer a refund, although Cross did eventually agree to accept the returned items and agreed to provide a partial refund to Exos.

99.    Cross and Sacramone at first claimed that they were also victims who had been defrauded by Snooz and further claimed that they were working with Guven Acarer ("Acarer"), who they described as a federal agent, to investigate Snooz's activity.

100.    Acarer provided a business card representing himself as a federal agent and described himself as such.

101.    Acarer is not, on information and belief, a federal agent or federal employee of any kind.   On the contrary, Acarer is an associate of Cross and Sacramone with an ownership interest in ASAP Turkey who was masquerading as an agent in an effort to mislead Exos and KG into abandoning their claims against ASAP.

102.    The business card provided by Acarer lists a telephone number and email address, which purport to be a federal email address and phone number, both of which are fake.

103.    To date Exos has not received any refund, either partial or otherwise, from ASAP, Cross, or Sacramone despite repeated demands.

104.   Prior to discovering that ASAP was distributing defective and mislabeled products, KG and its affiliates had agreed to obtain medical grade nitrile gloves for another end customer via ASAP, this time arranging and paying for the order through Cardinal.

105.   The remainder of the gloves were provided by ASAP to Cardinal and were produced directly by the sham Niujian without using Snooz as a middleman.

106.   On December 29, 2020, through ASAP, Niujian contracted to provide 1,000,000 boxes of medical grade nitrile gloves to Cardinal at a price of $8.20 per box.

107.   Niujian provided an invoice to Cardinal for $8,447,500, which included the full cost of the gloves as well as the initial shipping charge, on that same date, with the gloves scheduled to ship three days later.

108.   This order, like the gloves previously supplied by Snooz, also involved significant delays in delivery, as well as at least some defective or counterfeit products.  The defects of the non-conforming gloves matched those of the defective gloves provided by Snooz.

109.   Some of the nitrile gloves delivered were actually legitimate, thus causing a delay in discovering the defects in the remaining gloves supplied by Niujian.

110.   Some of the gloves ordered from Niujian have yet to be delivered despite ASAP and Niujian having received full payment.

111.   Cardinal has contacted ASAP, Cross and Niujian, both directly and through its agents, in an effort to recover the substantial funds lost due to defective products supplied by ASAP and its affiliates or associates.

112.  Exos and Cardinal – and accordingly KG – have lost the entirety of the millions of dollars paid to Snooz and to Niujian for the gloves.

113.  Exos and Cardinal have suffered $20,262,000.00 in direct, indirect and consequential damages arising from the costs of purchasing, transporting and delivering the gloves, investigating the legitimacy of the gloves after being notified of defects by its customers, in the lost use of its funds, in inability to timely fill purchase orders and in potential reputational harm.

114.  Upon information and belief, Cross, Sacramone, Fermin and/or Pena Fermin exercised complete dominion over Snooz in all aspects of the gloves transaction.

115.  Upon information and belief, Cross, Sacramone and ASAP exercised complete dominion over Niujian in all aspects of the glove transaction.

116.  This dominion was used to commit a wrong against KG, Exos and Cardinal which resulted in injury to KG and its affiliates.

117.  Upon information and belief, at all times relevant to this Complaint, Cross and Sacramone failed to maintain a formal legal separation between ASAP and their personal financial affairs, thereby rendering the ASAP business entity as the alter ego of Cross and Sacramone.

**THE 9mm AMMUNITION**

118.  In early-mid 2021, Cross approached a different affiliate of KG, M42, offering a large amount of ammunition at a substantially below-market cost.  Just as PPE had been in

2020, ammunition in large quantities was in very short supply and difficult to obtain in early 2021.

119.   Cross claimed that the ammunition deal would be sufficiently lucrative to offset the losses suffered by KG, Exos and Cardinal due to the counterfeit PPE.  Cross further stated that if she were lying, she would offer her Lamborghini as compensation.

120.   Cross claimed that she had a special relationship and exclusive distributorship with MKE, enabling her to offer 9mm 124gr brass case FMJ rounds manufactured by MKE for $.15 per round.  This price was well below market cost.

121.   This time, Cross described Acarer as a Colonel in the Turkish Army, and Turkey's Pentagon liaison from NATO.  Acarer confirmed this description and represented himself as a NATO liaison to M42, abandoning the role of United States agent.

122.   Cross represented that the ammunition she was offering had been manufactured by Makina Ve Kimya Endustrisi A.S. ("MKE").

123.   MKE is the leading provider of military products in Turkey and one of the primary providers of high-quality ammunition internationally.

124.   MKE is, upon information and belief, affiliated with the Turkish government and is the official ammunitions manufacturer of Turkey.

125.   On information and belief, at some point between selling the counterfeit PPE to KG and its associates, and representing herself as an exclusive dealer of MKE products, Cross made a payment of several million dollars to the Turkish Ambassador to the United States.

126.  M42 had a customer who was seeking to purchase MKE-manufactured 9mm 124gr brass case FMJ rounds in large quantities.

127.  KG and M42 initially declined to work with Cross as her price was suspiciously far below market for MKE products.

128.  Cross persisted and represented that she had extensive contacts that enabled her to obtain MKE ammunition at prices and quantities that were not available to anyone else in the market.  Cross specifically named Ambassador Mercan as a close associate.

129.  Cross supported this claim by providing pictures of herself with Ambassador Mercan, the Turkish Ambassador to the United States, as well as providing contact information for individuals at the embassy and other legitimate agencies, in an effort to convince KG and M42 that she could in fact provide MKE ammunition at the prices and quantities she was claiming.

130.  Cross further claimed to have an exclusive relationship with an MKE distributor and that, as of 2022, Cross and ASAP would become the exclusive dealer for MKE ammunition.

131.  Cross repeatedly suggested that M42 contact Ambassador Mercan or a member of his staff to vouch for her relationship with MKE.  Cross further provided a formal Full Corporate Offer ("FCO") offering to sell M42 50,000,000 rounds of MKE 9 mm ammunition at $.15/round for a total contract price of $7,500,000.  Cross attached a product specification sheet bearing MKE's distinctive logo and purporting to describe genuine MKE-manufactured ammunition.

132.  Believing Cross and ASAP were legitimate after the extensive representations described in paragraphs 128 through 131, M42 took a purchase order from a customer for 180 million rounds of 9mm ammunition upon assurances from Cross that MKE could produce 30 million rounds monthly until the purchase order was filled. The total purchase order was in the amount of $47,700,000, with a profit back to M42 of $20,700,000.

133.  Cross immediately began pressuring M42 to provide a payment of $1,400,000 to secure the MKE ammunition at the price-point and quantities in the FCO.

134.  Based on the FCO, on September 27, 2021, M42 generated a Purchase Order for 50,000,000 rounds of MKE 9mm brass 124gr FMJ ammunition for a total purchase price of $7,500,000. but refused to provide payment in advance.

135.  M42 insisted upon being able to inspect and verify the ammunition before any payment would be made.

136.  Cross made multiple representations and excuses as to why the ammunition could not be viewed by an inspector from M42.  Finally, Cross stated that the ammunition was not being manufactured in Turkey, where MKE is based, but was instead being manufactured in Serbia by Prvi Partizan (PPU) under an official partnership with MKE.

137.  Upon information and belief, PPU has no relationship with MKE and does not manufacture MKE ammunition.

138.  Upon information and belief, MKE has no relationship with ASAP, ASAP Turkey or Cross.

139.  Upon learning that Cross had no actual access to the MKE ammunition that she was claiming, M42 rescinded its Purchase Order.

140.  Upon information and belief, Cross and ASAP Turkey then began offering their nonexistent ammunition to other purchasers, including M42's contracted customer.

141.  As a result, M42's customer rescinded its $47 million dollar Purchase Order, believing that it could obtain ammunition from ASAP Turkey at a lower cost.  Further, M42's customer accused M42 of dishonest pricing.

142.  M42 lost $47.7 million in lost gross revenue, nearly $21 million in lost profit, and close to $150 million in lost market capitalization due to M42 being unable to fulfil the purchase order rescinded by its customer as a direct result of Cross's and Acarer's fraudulent misrepresentations and lies.

143.  Upon information and belief, MKE never offered its ammunition at the cost quoted by Cross to any buyer and neither Cross nor ASAP had access to legitimate MKE ammunition at any time in 2021 or 2022.

144.  Upon information and belief, Cross, Acarer and ASAP exercised complete dominion over ASAP Turkey in all aspects of the ammunition transaction.

145.  This dominion was used to commit a wrong against KG and M42 which resulted in substantial injury to KG and M42.

146.  Upon information and belief, at all times relevant to this Complaint, Cross and Acarer failed to maintain a formal legal separation between ASAP, ASAP Turkey, and their

personal financial affairs, thereby rendering the ASAP and ASAP Turkey business entities as the alter ego of Cross and Acarer.

## COUNT ONE
### (Breach of Contract - 3M Masks)
### Defendants Snooz, Fermin and Pena Fermin

147.  Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

148.  The Snooz Invoices are singularly and collectively a valid and binding contract to which Snooz was bound.

149.  In the Snooz Invoices, Snooz promised to supply Plaintiffs with 2,705,000 genuine 3M 1860 N95 Niosh masks for the $6,858,500 in consideration that Plaintiffs agreed to pay for the masks.

150.  Plaintiffs performed under the contract when they paid $6,858,500 in consideration for 2,705,000 genuine 3M 1860 N95 Niosh masks.

151.  Snooz breached its contract with Plaintiffs by supplying Plaintiffs with masks that were counterfeit and that were not genuine 3M 1860 N95 Niosh masks.

152.  Defendants have refused to reimburse Plaintiffs for Snooz's breach of contract.

153.  Snooz's breach of contract caused incidental costs and damages in excess of the funds initially paid to Snooz by Exos.

154. As a direct and proximate result of Defendants' breach, Plaintiffs is entitled to $10,309,970 in damages.

## COUNT TWO
### (Breach of Contract - Nitrile Gloves)
### Defendants ASAP, Cross, Sacramone, Snooz, Fermin and Pena Fermin

155. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

156. The ASAP and Niujian Invoices are singularly and collectively a valid and binding contract to which ASAP, Snooz and Niujian were bound.

157. In the ASAP Invoice, Snooz promised to supply Plaintiffs through ASAP with genuine medical grade nitrile gloves in exchange for the financial consideration that Plaintiffs agreed to pay for the gloves.

158. In the Niujian Invoice, Nijuian promised to supply Plaintiffs through ASAP with 1,000,000 genuine medical grade nitrile gloves in exchange for the $8,447,500 in consideration that Plaintiffs agreed to pay for the gloves.

159. Plaintiffs performed under the contract when they paid ASAP in consideration and Niujian in consideration for genuine medical grade nitrile gloves.

160. Defendants breached the contract with Plaintiffs by supplying Plaintiffs with gloves that were counterfeit and that were not genuine medical grade nitrile gloves.

161. Defendants' breach of contract caused incidental costs and damages in excess of the funds initially paid to Defendants by Plaintiffs.

162. Defendants have refused to reimburse Plaintiffs for Defendants' breach of contract.

163. As a direct and proximate result of Defendants' breach, Plaintiffs is entitled to $20,262,000 in damages.

## COUNT THREE

### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### Defendants ASAP, Cross, Sacramone, Snooz, Fermin and Pena Fermin

164. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

165. Plaintiffs contend that Defendants breached the express terms of each of the Invoices, as set forth above. In addition to such express breach, Defendants additionally breached the covenant of good faith and fair dealing.

166. The Snooz Invoices, the ASAP Invoice and the Niujian Invoice each contained an implied covenant of good faith and fair dealing, providing that neither party would act to deprive the other of the benefits of the agreement between them.

167. Defendants' conduct in selling masks to Plaintiffs that purported to be genuine 3M 1860 N95 Niosh masks, but that were instead counterfeit, represents a breach of the covenant of good faith and fair dealing between Defendants' and Plaintiffs.

168. Defendants' conduct in selling gloves to Plaintiffs that purported to be genuine medical grade nitrile gloves, but that were instead counterfeit, represents a breach of the covenant of good faith and fair dealing between Defendants' and Plaintiffs.

169. As a result of Defendants' breach, Plaintiffs have suffered and are entitled to $30,571,970 in damages.

## COUNT FOUR

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

### Defendants ASAP Turkey, Cross and Acarer

170. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

171. Plaintiffs contend that Defendants breached the express terms of the Full Corporate Offer, as set forth above.  In addition to such express breach, Defendants additionally breached the covenant of good faith and fair dealing.

172. The Full Corporate Offer contained an implied covenant of good faith and fair dealing, providing that neither party would act to deprive the other of the benefits of the agreement between them.

173. Defendants' conduct in offering ammunition to Plaintiffs that purported to be genuine MKE 9mm rounds, but that were instead non-existent and/or counterfeit, while demanding an initial payment in excess of one million dollars, represents a breach of the covenant of good faith and fair dealing between Defendants' and Plaintiffs.

174. As a result of Defendants' breach, Plaintiffs have suffered and are entitled to no less than $47,000,000 in damages.

## COUNT FIVE

### (Fraudulent Misrepresentation)

### All Defendants

175. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

176. Defendants made affirmative misrepresentations of fact and intention to Plaintiffs when they promised and contracted to provide genuine PPE products, including both 3M masks and nitrile gloves, to Plaintiffs and instead provided counterfeit products.

177. Defendants made affirmative misrepresentations of fact and intention to Plantiffs when they promised and contracted to provide genuine MKE ammunition to Plaintiffs and instead had no such products, provided no such products, and rendered Plaintiffs unable to meet their obligations to their customers.

178. Defendants knew or had reason to know that the products they were offering for sale and that they eventually provided to Plaintiffs were not legitimate, genuine 3M masks and nitrile gloves but were instead counterfeit products manufactured by sham organizations affiliated with or controlled by Defendants.

179. Defendants' misrepresentations that they could provide genuine PPE products in the desired quantities were made for the purpose of inducing Plaintiffs to act upon those representations by purchasing products from Defendants rather than from other competing legitimate suppliers.

180. Defendants' misrepresentations that they could provide genuine MKE ammunition in the desired format and quantities were made for the purpose of inducing Plaintiffs to act upon those representations by paying Defendants rather than seeking to purchase products from other competing legitimate suppliers.

181. Defendants made further misrepresentations of fact when they claimed to be working with United States officials to resolve counterfeit product issues by misrepresenting Defendant Acarer as a federal investigator or, alternatively, as a Turkish official representative.

182. Plaintiffs acted in justifiable reliance upon Defendants' misrepresentations and suffered pecuniary loss thereby of at least $71,271,970.

## COUNT SIX
### (Breach of Express Warranty - N.Y. U.C.C. Law § 2-313(1)(a) – 3M Masks)
### Defendants Snooz, Fermin, Pena Fermin

183. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

184. Snooz is a merchant with respect to PPE and the masks at issue in this matter.

185. On or about November 18, 2020, November 23-24, 2020, December 4, 2020, and December 21, 2020, Plaintiffs paid $6,858,500 to purchase 2,705,000 genuine 3M 1860 N95 masks from Snooz.

186. By listing the masks as "1860 N95 Niosh masks," on the Snooz Invoices, Snooz expressly warranted by an affirmation of fact, and/or a description of the goods that the masks were genuine 3M Model 1860 masks.

187. Plaintiffs relied upon the express warranty that the masks were genuine 3M Model 1860 masks in entering into and performing under the contracts and paying the invoices. Without this affirmation of fact by Defendants, Plaintiffs would not have entered into the contracts.

188. Defendants breached this express warranty by selling Plaintiffs masks that were counterfeit and that were not genuine 3M products.

189. Defendants made no efforts to exclude this express warranty from the sales contract.

190. As a result of Defendants' breach, Plaintiffs have suffered damages in the amount of $6,858,500 which represents the difference between the value of the goods as delivered (zero) and the value they would have been if they had been as warranted.

## COUNT SEVEN

**(Breach of Express Warranty - N.Y. U.C.C. Law § 2-313(1)(a) – Nitrile Gloves)**

**Defendants ASAP, Cross, Sacramone, Snooz, Fermin, Pena Fermin**

191. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

192. ASAP and Snooz acted as merchants with respect to PPE and the gloves at issue in this matter.

193. On or about and between November of 2020, and December of 2020, Plaintiffs paid $20,262,000 to purchase genuine medical grade nitrile gloves from Snooz and from ASAP through Niujian.

194. By listing the gloves as "nitrile gloves," on the Invoices, Snooz and ASAP expressly warranted by an affirmation of fact, and/or a description of the goods that the gloves were genuine nitrile gloves.

195. Plaintiffs relied upon the express warranty that the gloves were genuine nitrile gloves in entering into and performing under the contracts and paying the invoices. Without this affirmation of fact by Defendants, Plaintiffs would not have entered into the contracts.

196. Defendants breached this express warranty by selling Plaintiffs gloves that were counterfeit and that were latex and not genuine nitrile products.

197. Defendants made no efforts to exclude this express warranty from the sales contract.

198. As a result of Defendants' breach, Plaintiffs have suffered damages in the amount of $20,262,000 which represents the difference between the value of the goods as delivered (zero) and the value they would have been if they had been as warranted.

**COUNT EIGHT**

**(Unjust Enrichment)**

**Defendants ASAP, Cross, Sacramone, Snooz, Fermin and Pena Fermin**

199. Plaintiffs incorporate by reference all preceding allegations of this Complaint as though set forth fully herein.

200. Plaintiffs entered into contracts with Defendants in which Defendants undertook to provide legitimate, genuine PPE products in exchange for payment.  In each instance, Plaintiffs provided payment in full in advance of receiving any PPE products.

201. Defendants provided counterfeit, illegitimate products that did not meet the requirements of Plaintiffs or of Plaintiffs' customers, all of which had been made known to Defendants in advance.

202. Defendants caused Plaintiffs to refund millions of dollars to their customers and to risk reputational harm in addition to their pecuniary losses.

203.  Plaintiffs have paid millions of dollars to Snooz and to ASAP and have received no legitimate or usable products in exchange.

204.  Defendants have not refunded any of the unearned fees to Plaintiffs.  Defendants have not provided any benefit or usable product to Plaintiffs in exchange for the funds they unjustly received.

205.  It is against equity and good conscience to permit Defendants to continue to be enriched at Plaintiffs' expense by allowing them to retain Plaintiffs' property without compensation.

206.  As a result of Defendants' actions, Plaintiffs have been forced to expend additional funds and have been unjustly denied the use and enjoyment of their property.

207.  As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer damages in an amount exceeding $30,571,970, to be proven at trial.

**COUNT NINE**

**(State Unfair and Deceptive Trade Practices)**

**All Defendants**

208.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

209.  Defendants have been passing off, and continue to pass off, their goods and services as those of legitimate businesses, causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval of Defendants' goods and services, causing a likelihood of confusion as to Defendants' affiliation, connection, or association with legitimate businesses, and/or otherwise damaging the public. Defendants' conduct constitutes unfair and deceptive

acts in the conduct of business, trade, commerce or in the furnishing of services in violation of New York General Business Law § 349.

1.  Defendants' unauthorized use of the 3M, Nijuian and MKE logos and names have caused and is likely to continue to cause significant injury to Plaintiffs and to the public, and Plaintiffs are entitled to damages, attorney's fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kaplan Group Investments LLC, Exos Funds MRP1 LLC, Cardinal Specialty Credit Fund LLC and M42 Tactical Inc. pray for judgment against Defendants as follows:

A.      For damages in the amount of $71,271,970.00;

B.      For Plaintiff's attorneys' fees and costs;

C.      For pre-judgment and post-judgment interest; and

D.      For such other and further relief as the Court deems just and proper.


Dated: August 26, 2022

Respectfully submitted,


Parlatore Law Group, LLP


By:   _/s/ Maryam N. Hadden____
Maryam N. Hadden
One World Trade Center, Suite 8500
New York, NY   10007
Tel. 646.846.6382
Email: Maryam.hadden@parlatorelawgroup.com

*Attorneys for Plaintiffs*